Abel Medrano #1743611
Dalhart Unit TDCJ
11950 FM 998
Dalhart, Texas 79022

May 18, 2015

Abel Acosta, Clerk
Court of Criminal Appeals
P.O. Box 12308, Capitol Station
Austin, Texas 78711

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAY 26 2015

Abel Acosta, Clerk

    RE:  WR-82,939-01

    Sub:  Applicant's Pro Se Rebuttal

Dear Clerk:

Enclosed please find for filing Applicant's Por Se Rebuttal to the State's Response to Application for Writ of Habeas Corpus, §§11.07, 11.073. Please file date stamp and bring to the attention of the Court.

Also enclosed, please find a copy of this letterhead. Please file date stamp same and return in the provided self addressed stamped envelope.

Thank you for your assistance on this matter.

Sincerely,

Abel Medrano

AM/
  cc: FILE
      Attorney for the State, Larry Allison, VIA SNAIL-MAIL

*P.S. Also enclosed please find Exhibits A thru R to be filed among the papers herein named.*

NO. WR-82,939-01

IN THE

COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

| | | |
|---|---|---|
| EX PARTE | § | ORIGINATING IN THE 27th |
| | § | DISTRICT COURT IN AND FOR |
| ABEL MEDRANO | § | LAMPASAS COUNTY, TEXAS |

### APPLICANT'S PRO SE REBUTTAL
### TO THE STATE'S RESPONSE TO APPLICATION FOR
### WRIT OF HABEAS CORPUS, §§ 11.07, 11.073

TO THE HONORABLE JUSTICES OF THE COURT OF CRIMINAL APPEALS:

COMES NOW, Applicant Abel Medrano, Texas Department of Criminal Justice(TDCJ)-ID #1743611 hereinafter Medrano and files this Applicant's Pro Se Rebuttal to the State's Response to Application for Writ of Habeas Corpus, §§ 11.07, 11.073, and offers this Honorable Court the following in support thereof:

### Statement of the Facts and Procedural History

On January 28, 2015, Medrano filed his State Application for Writ of Habeas Corpus, §§ 11.07, 11.073, in the 27th Judicial District Court of Lampasas County, Texas, by depositing same in the TDCJ Dalhart Unit's internal mailing system pursuant to the Texas Rule Appellate Procedure(TRAP) Rule 5. On or about March 26, 2015, Medrano received notice that this Court's Clerk had received and filed said petition. On March 30, 2015, Medrano sent correspondence to district clerk requesting a copy of the State's Response.

1

On or about April 10, 2015, Medrano received same correspondence back from the district clerk stating the following:

"Please know that the information you are requesting is on page 93 in the paper work that was mailed out to on February 27th, 2015."

Pursuant to TRAP Rule 5, Medrano filed Motion to Stay Proceedings in this Court, which was denied on the 14th. Conformation of same was received on the 17th. On or about April 23, 2015, Medrano received a copy of the State's Response accompanied by the Findings of Fact and Conclusion of Law. This notification was received as regular mail due to the clerk's failure to put return address on envelope. Thus, there will be no record in the Dalhart Unit's mail room log. (see Exhibit A).

## Summary of the Argument

The State has issued their Response to Medrano's Application for Writ of Habeas Corpus, §§ 11.07, 11.073, which is nothing more than a general denial (boiler plate) resulting in a decision that is contrary to, and based on an unreasonalbe determination of the facts and the records, in light of the evidence presented at the state court proceeding.

## Argument

The State's Response to Medrano's State Application for Writ of Habeas Corpus, §§ 11.07, 11.073, is nothing more than a general denial, basically printing a formatted screen off their computer, after adding the proper names and dates, ect., only addressing the first fact from the first ground, even though they acknowledge that there are eleven grounds total that were presented.

2

Due to the fact Medrano is actually innocent and the State's "Findings of Fact" only **briefly** addressed Ground Two, Exculpatory Scientific Evidence-Untested, §11.073, a new addition to the Code of Criminal Procedures(CCP), which provides in part:

(a) This article applies to relevant scientific evidence that:

(1) was not available to be offered by the convicted person at the convicted person's trial; or

(2) contradicts scientific evidence relied on by the State at trial.

(b) A court may grant a convicted person relief on application for writ of habea corpus if:

(1) the convicted files an application, in the manner provided by Article 11.07, 11.071, or 11.072, containing specific facts indicating that:

(A) relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and

(B) the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application; and

(2) the court makes the findings described by Subsection (1)(A) and (B) and also finds that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted. see CCP §11.073(Vernon's Ann. 2013)

this rebuttal will begin there, incorroporating Ground One within and extend into Grounds Three, Four and Six, due to the relevancy of documents now available° and being brought to light and offered

---

° See Original Memorandum at page 7 °.

3

to this Court to ensure a fundamentally fair proceeding.

Medrano contends that the State's "Findings of Fact's" claim "Applicant's claims under 11.073 are not supported by any factual basis or claim of scientific evidence that was not available at the time of trial or contradicts any evidence presented at trial" is in itself contradictive to the record, erroneous, and without merit, citing no facts the State based their unreasonable determination on.

Medrano's first two facts of Ground Two in his application, plainly states:

> 1) The only scientific evidence relied on by the State, fails to prove beyond a reasonable doubt the allegation of sexual assault by penetration.
> 2) Additional exculpate scientific evidentual DNA evidence, or the **lack of** from within the pants Lisa put back on right after the alleged incident and wore back to Burnet without panties, will not indicate the presence of semen.

while same is supported by the record and clearly cited in his Memorandum in Support beginning at 11.

Medrano contends the only factual and scientific evidence available and relied upon by the State in his conviction, fails to provide evidence beyond a reasonable doubt, the allegations contained within the charging instrument of sexual assault by penetration. (C.R. 1, p. 12).

Medrano argues that the State both possessed and unconstitutionally suppressed exculpatory evidence from the defense and that that evidence not only was favorable to [M]edrano because it was, and still is exculpatory and impeaching, Healy v. Spencer, 397 F. Supp.2d 269, 289 (D.Mass. 2005), but the favorable evidence could

4

very well have been reasonably taken to put the whole case in such a different light as to undermine the confidence in the guilty verdict. Strickler v. Greene, 527 U.S. 269, 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed. 2d 490 (1995)). This scientific, exculpatory and impeaching prima facie evidence that is purportedly untested is not just the pants' failure to indicate the presence and STR DNA profile of biological evidence that is a match to Medrano's profile but, is the State's experts' inability to provide factual and scientific evidence of sexual activity by penetration, clearly favorable to the defense.

Medrano argues, had Lisa factually been "wet" in her vaginal area, "the same kind of feeling" she has "felt after having sex," (see Exhibit B*) and since she put those pants on right after the alleged incident and wore them without panties back to the AmVets Club, where she got into her car and drove herself all the way to Burnet, approximately 38 miles, the presence and STR DNA profile of Medrano's biological evidence, without a doubt, would definitely been present in the crotch area of those pants. Yet, not only did Watson purportedly opt not to test such prima facie evidence (R.R. 8, p. 71) but, even though Ryan diligently soughtout and purposely included same with the other items sent to the Waco DPS Crime Lab (see Exhibit C* and D*, yellow highlight), specifically requesting an analysis to "determine the presence and STR DNA profile of boological evidence" (see Exhibit H*, pink highlight), the State and Ryan purportedly approved of this failure to comply with his requests and failure to follow protocol?

* Photo copy of same.

5

Medrano argues that this sort of prima facie evidence was in fact tested and the results of said tests were unconstitutionally withheld from the defense.

Medrano contends that the State knew that the lab's analysis came back negative to the STR DNA profile of the biological fluid found on the vehicle's passenger's car seat, but chose not to advise the defense of Watson's conclusion, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Medrano argues that this compelling exculpatory and impeaching prima facie scientific evidence, or the conceded lack of same clearly and convincingly implicates Lisa's allegations as being perjured and impeaches her testimony.

Medrano argues had his trial counsel properly developed, introduced and, presented to the jury, the factual results of this certain alleged exculpatory and impeaching prima facie scientific evidence, i.e., Lisa's pants' failure to indicate the presence and STR DNA profile of Medrano's biological fluids, see Washington v. Murray, 952 F.2d 1472, 1476 (C.A. 4, 1991), this certain and favorable evidence would reasonably be taken to put the whole case in such a different light as to undermine the confidwence of the verdict. Id., Strickler, 527 U.S. at 290, 119 S.Ct. 1936.

Had the pro se motion for forensic DNA testing been granted, (see Exhibit F*) and DNA tests completed on Lisa's pants, Medrano would be able to provide the necessary prima facie evidence in his State habeas proceeding to prove his innocence.

Therefore, for the aforementioned reasons in Grounds One and Two, this Honorable Court should grant habeas relief, vacating the

6

conviction and remanding the case back to trial court for further proceedings, i.e., discovery/evidentiary hearings on the exculpatory results and remand the matter for a new trial.

In Ground Three Medrano contends the State knowingly and intentionally introduced and presented to the state court fraudulent testimony of Lisa and their expert witnesses Watson and Coats at trial, thereby incriminating Medrano and undermining the integrity of the verdict. Carter v. Johnson, 110 F.3d 1198, 1104 (5th Cir. 1997).

To succeed on such a claim and obtain reversal based on the State's presentation of perjured testimony, a defendant must establish three elements showing (1) the testimony was actually false and presented at trial; (2) that the State had actual knowledge that the testimony was false; and (3) the false testimony is "material," so as to be a highly significant factor reasonably likely to have affected the jury's verdict. Blackmon v. Scott, 22 F.3d 560, 565 (5th Cir. 1994); see also Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); May v. Collins, 955 F.2d 299, 315 (5th Cir.), cert. denied, 504 U.S. 901, 112 S.Ct. 1925, 118 L.Ed. 2d 533 (1992).

Medrano contends now that he is in the possession of his legal documents necessary to provide factual evidence as proof beyond a reasonable doubt that: (1) testimony by both of the State's expert witnesses Watson and Coats, were factually fraudulent; (2) the State had actual knowledge of same; and (3) the false testimonies were "material," so as to be a highly significant factor reasonably likely to have affected the jury's verdict. Id..

7

First and foremost, State's expert witness Watson, testified that he opt noy to test prima facie evidence, i.e., Lisa's pants, even though the State's lead Sgt. Investigator Tim Ryan diligently soughtout and purposely included said pants with the TX100 Sexual Assault Evidence Collection Kit and the four swabs used to collect possible DNA from the vehicle, specifically requesting to "Process for DNA and find possible match" (see Exhibit E*, yellow highlight). Watson's reasoning for opting not to test the pants was that semen from the car seat had identified Medrano even though identity was never an issue. (see Exhibit E,I*,J*[2],K*[3], blue highlight).

Medrano argues that, records are now available that clearly and convincingly state otherwise contradicting Watson's testimony that he opt not to test Lisa's pants because semen from the car seat had identified Medrano. (R.R. 8, p. 71). Thus providing substantial evidence that, at least that portion of his testimony to be in fact perjured, as discussed below.

The first pertinent record pertaining to this ground, is the "Laboratory Submission Form," which not only clearly indicates on October 30, 2009, did Ryan submit the collected items to the Waco DPS Crime Lab, specifically requesting for Watson to "Process for DNA and find possible match" (Id.), but most importantly, (1) Medrano has already been identified prior to any STR DNA profile's search (see Exhibit E,I, blue highlight); and (2) in a brief case synosis Ryan typed the following:

---

[2] In the State's Response to Movant's Request for DNA Testing, the State clearly and convincingly acknowledge "Identity was not an issue in the case tried to a jury in this cause ..."

[3] "since the victim has identified Abel Medrano as the person who assaulted her ..."

8

"Points of interest in this sexual assault case. Suspect / Medrano
has not been located to arrest and therefore there is no DNA swabs
taken from him however, he is a convicted felon and there may be
DNA for him on the CODIS. The jeans submitted were left as receiv-
ed and worn after the sexual assault without underwear, which were
never found." (Id.)

(see pink highlight). Therefore, Ryan not only informed Watson of
the significance of testing the pants but, also informed him that
Medrano was in fact identified as the sole suspect in the case and
that there was no DNA swabs available to test against any profiles
hopefully recovered from any of the items submitted, especially
from Lisa's pants.

The second record, the "Evidence Return Report" (see Exhibit
G*), clearly indicates that Watson returned same to the Lampasas
Police Depart., where a Charlie Roswell placed same back into the
evidence room on August 12, 2010.

The third and foremost, pertinent record, the "Serology / DNA
Report" (see Exhibit H*), clearly indicates that Watson completed
his report and submitted same to Ryan on September 24, 2010, with
Medrano identified as the sole "Suspect(s)" (see blue highlight),
and listing all of the "Evidence Submitted" by name and giving an
"Item" number to each, with Lisa's pants listed as "Item 3 Jeans"
(see yellow highlight). It then clearly indicates the "Requested
Analysis" with only two distinct requests. (1) Determine the pre-
sence and STR DNA profile of biological evidence; and (2) Enter
profiles into the Combined DNA Index System(CODIS). Thus, speci-
ficially requesting Watson to determine if [M]edrano's STR DNA
biological fluids were present on any of the items because if the

9

Court will take notice, Ryan pluralized the word "profile" hoping to find the presence and STR DNA profile of biological evidence on more than one of the items submitted (see Exhibit D and E).

Medrano argues that no where in Ryan's requested analysis or in his brief case synopsis for that matter does Ryan give any indication that he wanted Watson to stop testing when the CODIS had located a possible match from the first and only item that tested positive for the presence and STR DNA profile of Medrano's biological fluids. Especially from the one item every one already knew would prove to be linked to that of Medrano's profile. i.e., Item 2, swabs from vehicle. Nor, does Ryan ever state identity was the issue he was wanting the answer to. When in fact, by the State's own admission in their Response to Movant's Request for DNA Testing, at I, the State clearly and convincingly state "Identity was not an issue in the case tried to a jury in this case ..." (see Exhibit J*, blue highlight).

Medrano renews his argument that evidence of the presence of semen on a car seat does not prove penetration. Medrano contends, due to the fact Watson has preformed forensic testing in criminal case for a number of years, he understood the significance of completing tests on all of the itms submitted by Ryan, especially Item 3. For the prsence and STR DNA profile of biological evidence in the crotch area of Lisa's pants matching that of Medrano's, without a doubt, would be unprecidented evidence against the defense, that penetration had in fact occurred. Medrano argues that Ryan and the State also knew the significance and that there is no possible way either of them would have allowed Watson not to test

10

such prima facie evidence for the presence and STR AND profile of Medrano's biological fluids. However, on the other hand, the failure to indicate same, would in fact be unprecidented evidence favorable for the defense. Medrano contends, even though Watson, Ryan and the State knew the significance of such a failure, those pants had to be tested for two reasons. Ryan and the State had to know whether or not the results would prove favorable to them for their case, and, for such a failure would and in fact has, denied Medrano of his due process rights because the forensic scientist, Watson did not follow accepted standards when analyzing the evidence in his case and thereofre rendering the results of his analysis to be unreliable. See Ex parte Roslyn, 394 S.W.3d 573 (Tex. Crim.App. 2013) LEXIS 748, NO. AP-76,973.

Medrano contends, since Watson was hired by the State to recover, test, document the findings of specific evidence, i.e., the STR DNA profile of Medrano's biological evidence, and find match, Watson did in fact test those pants. But when tests proved favorable to the defense, the findings were simply enough, never recorded, insofar as not to have to disclose same to the defense in violation of Brady. Id., 373 U.S. 83, 83 S.Ct. 1194.

Medrano argues, that such a failure for the pants not to indicate the presence of his biological evidence would, at the very least, impeach Lisa's testimony that she felt "wet down there", causing at least a 51% or better chance that Medrano would not have been convicted. Smith v. State, 165 S.W.3d 361, 363-364 (Tex. Crim.App. 2005).

Medrano argues, since the adversary parties did not want to

11

disclose such favorable evidence to the defense, Watson chose to give false testimony at trial, testifying that he opt not to test the pants because semen from the car seat had identified Medrano, (R.R. 8, pp. 68-69), even though "Identity was not an issue in the case tried to a jury in this case" (see Exhibit J*, at I, see blue highlight), and, "the results of such a test cannot positively identify a defendant as the perpetrator," (see Hilliard v. Spalding, 719 F.2d 1443, 1445(1983). Furthermore, the Court concluded, "but the test can conclusively exculpate an individual if the blood types do not match." Id. As in the case at bar where the test did or will exculpate Medrano because only Lisa's STR DNA profile was present. Medrano contends, had his trial counsel hired a forensic scientist to test Lisa's pants and document the analysis not only would the tests fail to match that of Medrano's but, it will only match Lisa's profile. And in the same token, Medrano would not have disclosed the results to the State, making them find out on their own as Medrano has already tried. Had his Motion for Forensic DNA Testing been granted, the exculpate results at this time, would have been available to be introduced in this proceeding and provide substantial evidence that: (1) Medrano is actually innocent; (2) there was no sexual assault; and (3) portions of Lisa's Coats' and Watson's testimonies are in fact perjured.

Medano now contends that, the same applies to Coats and her testimony (R.R. 7, p. 206), and her purported findings she both documented and failed to document during the exam on the Sexual Assault Examination Forensic Report Form. (see Exhibit I*).

Since Coats had been a sexual assault nurse examiner for the

past 14 years, certified by the Office of the Attorney General as a sexual assault nurse examiner (S.A.N.E.) for both pediatric and adult patients (R.R. 7, p. 175), and not only hired by the State to examine the alleged victim but, to produce a S.A.N.E. report that the State would be able to offer as evidence through her as a witness against Medrano, that penetration had in fact occurred (R.R. 7, p. 181). Therefore, she could not submit a report which failed to meet the statutory requirements to assist the State in proving a sexual assault occurred. For such a document at the very least, would prove favorable to the defense instead of the State. Thus, Coats did in fact, chose to falsify key pertinent portions of the Sexual Assault Examination Report Form (see Exhibit I*-1 thru I-8, pink highlight), insofar as to make it appear Lisa had been physically and sexually assaulted, as discussed below.

Coats falsified the following pertinent portions (1) checked the "penetration" box without authorization; (2) "noted stains on car seat and clothes" without examining either herself; (3) noted at Hymen "½cm abrasion note at 4 O'clock"; (4) marked same on the Body Diagrams at I-5; (5) marked unexplained bruises on next Body Diagrams at I-6. Coats also failed to document and describe medically the abrasion which she purportedly observed and admitted it was the only evidence she saw of penetration. Coats even purportedly destroyed her underlying noted from the exam that formed the basis for the S.A.N.E. report. Coats went as far as to testify that Lisa told her penetration has occurred (R.R. 7, p. 206) even though Lisa failed to testify to same herself insofar as to justify her checking the "penetration" box.

On cross examination, Coats admitted while the "penetration" box was checked on the patient history form, nowhere did the patient herself write the statement that she was penetrated, despite explicit instructions that she do so in that section of the exam. Protocol demanded that Lisa detail that element of the assault in her own words. (R.R. 7, p. 206). She then "noted stains on car seat and clothes" without examining the car seat herself and without any of Lisa's clothes worn the night of the alleged incident even being available to Coats during the exam. (see Exhibit I-2, pink highlight). In fact it was not until 17 days later after Lisa was able to locate and hand over her pants to Ryan, were they available to examine. (see Exhibit C, yellow highlight). She then noted a ½ cm abrasion at 4 O'clock on Lisa's hymen and drew same on the first of two body diagrams (see Exhibit I-5), but testified that if an injury had occurred on that date, it would have been healed by the time and date she made the examination. (R.R. 7, p. 197). She then testified that the injury to the hymen was consistant in time with the reported sexual assault and that penetration had to have occurred for there to be the type of injury noted to the hymen. (R.R. 7, p. 230). Thus, posing the question, if the injury had already healed (Id., at 197), how could she have noted a ½ cm abrasion? (Id., at 230). Coats also testified that she destroyed her underlying notes from the exam that formed the basis for the S.A.N.E. report (R.R. 7, p. 91) and most importantly, she failed to document and describe medically the ½ cm abrasion [s]he purportedly observed on Lisa's hymen, which was the only evidence [she] saw of penetration. (R.R. 7, p. 218-222). But then conceded

14

that it could have other causes, including sex with someone else, or vigorously cleaning herself. (R.R. 7, pp. 225-231). Therefore, it is possible the abrasion was caused by a finger rather than Medrano's sexual organ as stated in the indictment. Thus posing the questions, why would an expert S.A.N.E. nurse of 14 years fail to follow the demanded eastablished S.A.N.E. protocol so miserably when conducting and documenting a sexual assault examination on the alleged victim? Was it because she was employed by the State and discovered something she did not want to disclose to the defense as Watson did?

Medrano argues, because of Coats actions, or inactions, the answer is "yes" without a doubt. Had Coats truthfully completed the report form and followed eastablished protocol, the form not only would have been of little to no value to the State in providing evidence in determining if penetration had occurred but, the report form would have been more favorable for the defense, and Coats did not want that sort of prima facie evidence to be handed over to the defense on her account.

Medrano argues Coats committed perjury when she testified Lisa had told her penetraiton had occurred (R.R. 7, p. 206), not only for the simple fact Lisa could not testify to same but, she failed to tell any one else despite being asked about it "piontedly." (R.R. 8, pp. 45-46). Medrano contends that this was just another way Coats knew how to assist in the investigation since she was purportedly an expert witness for the State. What jury is going to question an expert even if she failed to follow protocol?

Medrano now argues that Coats' testimony and her drawings on

15

the Body Diagrams (see Exhibit I-5,I-6), of the purported ½ cm abrasion on Lisa's hymen and the "many unexplained bruises and tenderness on Lisa's body" (see Exhibit L*, yellow highlight), is also perjured testimony. (R.R. 7, pp. 218-222).

Coats testified that she observed a ½ cm abrasion that was on Lisa's hymen note at 4 O'clock and then drew a diagram showing what [s]he purportedly saw. Therefore, the abrasion was on the lower left side of her hymen. Yet, Lisa was in the passenger seat Medrano would have had to come from the driver's seat to where she was. From that position, Medrano argues the abrasion would have more likely than not, been on the oposite side of her hymen, being at the 9, 10 or 11 O'clock position because of the slanted angle he would have been coming from. This includes whether or not it was his sexual organ or, his finger. Which would have been pushing towards the upper right side of her hymen instead of her left side. Thus, making it virtually impossible for an abrasion to be where Coats testified she observed and documented same. Although the necessary documents are not available, Medrano argues, that the 4 O'clock position is Coats' most reported position of abrasions and her past documentations of same on past sexual assault patients will affirm this accusations. Thus posing the question, has Coats, or anyother S.A.N.E. nurse for that matter, ever examined an alleged sexual assault victim and found that there had been no sexual assault? Regardless how the 4 O'clock position came to be chosen, Coats had to say there was an abrasion of some sort, for it would provide the necessary evidence to prove penetration and the report would prove to be favorable to the State.

See Appellee's Brief at 3 and 6, which provides in part:

3. "The SANE report was offered as Exhibit #1 for the State through this witness." (R.R. 7, p. 181).

6. "There is evidence that penetration did occur both from the victim and from the SNAE report."

Then there is the many unexplained bruises and point tenderness(PT) on Lisa's body Coats reported she observed. (see Exhibit I-6). Medrano argues Ryan put it clearly enough by stating "unexplained bruises." (see Exhibit L*). Coats indicated 16 of them on her body. Yey the alleged incident took place inside a car on the padded seat that was reclined. (R.R. 6, p. 42). Thus posing the question, how could have Lisa sustained all of those "unexplained bruises?" Thus causing Coats' testimony to lack credibility.

Medrano now contends that portions of Lisa's testimony given at trial and on her voluntary statement, are also perjured, as discussed below.

Lisa testified she was "passed out" and did not remember anything Medrano did or said to her until she heard Walker screaming [her] name and banging on the door. (R.R. 6, pp. 41-42). Yet, an eyewitness, Christopher Cortez Hernandez(Hernandez) not only gave a statement to Ryan (see Exhibit M*, yellow highlight), but, also testified that he watched Medrano walk down to the passenger side door, and when the car's enterior lights came on while he was standing there, he could see him talking with Lisa, but could not hear what they were saying.[22] He then watched Medrano go around to

_____

[22] The trial court records have not been made available to Medrano for viewing purposes. Therefore, he is unable to cite the record to this account.

the back side of the car and get in the driver's door. Therefore, Lisa could not have been "passed out" as she claimed, and she had to have turned on the enterior lights to the car and unlocked the car door so Medrano could get in, since the car doors were locked according to her statement on the History of Assault. (see Exhibit I-2, yellow highlight).

Lisa then testified, that Walker woke her up screaming [her] name (R.R. 6, p. 41). Yet, both trial and voluntary statement records, clearly indicate that Walker screamed "Moses'" name, inter alia, not Lisa's name (R.R. 6, pp. 76-77)(see Exhibit M*, N*, O*, and P*, pink highlight). No where in Walker's testimony, does she indicate she ever yelled Lisa's name.

She also testified she felt "wet down there" (R.R. 6, pp. 59-60), stating "the same kind of feelin" she has "felt after having sex" (see Exhibit B).

Medrano contends, Lisa made this statement to make it appear penetration and ejaculation had occurred, even though it did not. Had this factually occurred and she felt wet in her vaginal area, Watson's forensic tests on Lisa pants would have indicated the presence and STR DNA profile of Medrano's biological body fluids, due to the fact Lisa put those pants on right after the alleged incident and without panties. (see Exhibit B, green highlight). Yet tests did, or will only indicate the presence of Lisa's biological body fluids.

Lisa went as far as to testify and state Walker drove her to Burnet in the first trial.[22] (see Exhibit B, pink highlight). Lisa then testified in the second trial that she drove herself home to

18

Burnet, where when she got there, she went straight in and took a shower. (R.R. 6, pp. 50-51). Even though Walker has always maintained that Lisa drove herself to Burnet, she testified that Lisa turned at the Storm's restaurant, instead of going home.[22] (see Exhibit N; yellow highlight). Which was not in the vicinity of her parents' house whom she lived with. Thus, not only indicating she did not go home but, why she could not find the pants she wore on that night until 7 days later, where she stated she had located them in another dirty clothes hamper. (see Exhibit C, blue highlight). Thus posing the questions, where did she actually go once she got to Burnet? Once she got to where ever she went, what happen there?

Medrano argues she went to a place she has stayed before and that she had some of her clothes there. The question then arises, was it a male's house? If so, what happen after she got there?

Medrano contends these are questions that should have been asked by Ryan with substantial answers from Lisa so Ryan could investigate her story.

Medrano argues Lisa had a motive and said so when she stated Medrano purportedly stole approximately $150.00 from her. (see Exhibit Q*, blue highlight). Thus causing Lisa's testimony to lack credibility with portions perjured as in Coats' and Watson's testimonies.

The due process clause prohibits the use of perjured testimony to obtain a conviction. See Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); see also Rayford v. Thaler 130 S.Ct. 1506-2011 U.S.Dist. LEXIS 152309; Black v. Collins, 962

F.2d 394, 407 (5th Cir.), cert. denied, 504 U.S. 992, 112 S.Ct. 2983, 119 L.Ed.2d 600 (1992). False testimony is material if "there is any reasonalbe likelihood that the false testimony could have affected the judgment of the jury. Creel v. Johnson, 163 F.3d 385, 391 (5th Cir. 1998), cert. denied, 526 U.S. 1148, 119 S.Ct. 2027, 143 L.Ed.2d 1038 (1999), quoting Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993).

To obtain a reversal based upon the prosecutor's use of perjured testimony, he must show that (1) the statements were actually false; (2) the state knew they were false; and (3) the statements were material, i.e., highly significant factor reasonably likely to have affected the jury's verdict. U.S. v. Blackburn, 9 F.3d 353 (5th Cir. 1993).

Medrano argues he has shown that the statements were in fact actually false, that the state new they were false and the statements were material.

Therefore, for the aforementioned reasons asserted in Ground Three, this Honorable Court should grant habeas relief, vacating the conviction and remanding the case back to the trial court for further proceedings, i.e., discovery/evidentiary hearings and remand the matter for a new trial.

In Ground Five, Medrano argues that the indictment is viod. He contends that he is now in the possession of the necessary document that clearly substantiates his claim. (see Exhibit R*).

First and foremost, tthe pseudonym form is in fact deficient and was partially filled out by someone other than Lisa.. Nor did Lisa sign and date the form like it was supose to have been to be

legally considered as a pseudonym. Then comparing the handwriting with that of Lisa's signature on the form completed by Coats (see Exhibit I-1), it is clearly obvious that it was not filled out by her. For whom ever filled out this form, they even misspelled her middle name "Renee", leaving off the last "e". Then there is a second party who wrote "Lisa Jo Evans" where the **Pseudonym\*** name is to be written on the form. Thus causing the indictment itself, to be fatally flawed because it does in fact fail to include all the necessary elements of a properly and legally filed indictment.

Therefore, this Honorable Court, should grant habeas relief, vacting the judgment for want of jurisdiction and remand the case back to the trial court for further proceedings. i.e., evidentiary hearing, reinstate and grant motion to quash the invalid and void indictment and remand the case back to trial court for further proceedings.

In Ground Six, Medrano not only argues the State, knowingly but, unconstitutionally suppressed material exculpatory prima facie evidence, or the lack of, from the defense in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct.1194, 10 L.Ed.2d 215 (1963). Besides the Brady violation, the State also suborned perjury and tampered with evidence both before and at trial. See Shuh Wei Su v. Filion, 335 F.3d 119, 127 (2d Cir.2003). Thus denying Medrano his right to a fair trial. Hilliard v. Spalding, 719 F.2d 1443, 1445 (C.A. Wash), U.S.App.LEXIS 15451.

The rule of Brady requires the state to disclose to the defendant all favorable evidence either to guilt or punishment. The suppression of favorable evidence is material "if there is a rea-

sonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id., at 373 U.S. 83, 83 S.Ct. 1194; see also Brogdon v. Blackburn 790 F.2d 1164 (5th Cir.1986), cert. denied,—U.S. _____, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987); Barnes v. Lynaugh 817 F.2d 336, 338-339 (5th Cir.19870.

The Due Process Clause of the Fourteenth Amendment, requires the State to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment. Id., Brady 373 U.S. 83, 83 S.Ct. 1194; see also United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Californis v. Trombetts 467 U.S. 479, 81 L.Ed.2d 413.

An individual prosecutor has a duty to learn of any favorable evidence to a defendant known to the others acting on the government's behalf in a case, including the police. Avila v. Quaterman 499 F.Supp.2d 713, 715, 716-717 (W.D.Tex. 2007). Significantly for Medrano's case, the rule in Brady encompasses evidence known only to the police investigator and not personally known by the prosecutor. Strickler v. Greene, 527 U.S. at 280-81, 119 S.Ct. at 1948; Kyles v. Whitley, 514 U.S. 419, 438, 115 S.Ct. 1555, 1558 (1995).

As stated in both this brief and Memorandum in Support, the State called expert witness Watson, the forensic scientist hired by the State to perform two distinct tests on items collected for this sexual assault case (see Exhibit E, yellow highlight). Among the itmes were Lisa's pants, in which she put back on right after the alleged incident and wore all the way to Burnet without panties. Thus causing this item to become prima facie evidence either

for the State or defense, pending the outcome of Watson's tests. Yet, Watson purportedly failed to complete the two distinct tests requested by Ryan. When questioned as to why he chose not to test such prima facie evidence, Watson testified he opt not to because semen from the car seat had identified Medrano (R.R. 8, p. 71), which is false by all means, as discussed below.

Medrano argues the State suborned perjury and, tampered with evidence as well both prior and at trial. Specifically, the State suborned perjury in connection with the grand jury and trial testimony of Watson's, by coercing him to testify falsely and withhold exculpatory evidence, having him testify that he "opt" not to test Lisa's pants because semen from the car seat had identified Medrano, **even though identity was never an issue**. (see Exhibit E, I-2, J, K, M, N, O, P,, blue highlight). Even by the State's own admossion in their Response to Movant's Request for DNA Testing, they clearly and convincingly state "Identity was not an issue in the case tried to a jury in this case..." (see Exhibit J, at blue highlight at I.).

Medrano argues, Watson did in fact test Lisa's pants. For it was not only his duty to test those pants but, it was the State's duty as well, to make sure he did test them, insofar as to learn of any evidence, whether or not favorable of the State. Id., Avila 499 F.2d at 716-717.

Medrano argues it was only after the tests failed to provide the evidence Ryan had hoped for (see Exhibit D), did the State decide not to disclose such favorable exculpatory, impeaching and mitigating evidence to the defense in violation of Brady. Id., 373

23

U.S. 83, 83 S.Ct. 1194.

Medrano contends, had the trial court granted his motion for DNA testing to be completed on Lisa's pants, he would have been able to provide this Honorable Court with the necessary exculpate results, where Lisa's pants only indicated the presence of Lisa's STR DNA profile, or that of some unknown profile, but not that of his. Thus constituting favorable exculpatory, impeaching and mitigating information suppressed by both the State and Watson. In re United States, 267 F.3d 132 (2d Cir. 2001).

Medrano argues had the presence of his STR DNA profile been indicated in Lisa's pants, it would have with out a doubt, been precidented evidence against the defense. But since there was not any indication, it would have been, and still is, unprecidented evidence in favor of the defnse, that the State knowingly and unconstitutionally suppressed from the defense in violation of Brady. Id., 373 U.S. 83, 83 S.Ct. 1194.

For the aforementioned reasons, this Honorable Court, should grant habeas relief, vacating the judgment, reinstate and grant the Motion for DNA Testing of Lisa's pants, and remand the case back to the trial court with the exculpate evidence for a new trial.

## CONCLUSION

Medrano contends due to thwe fact his personal trial court records, at no fault of his, were not made available prior to the filing of his initial State habeas, he did make some errouneous assertions that this Honorable Court should deem as moot. e.g., Illegal Seizure of Applicant's DNA, Ground Four, inter alia. But,

24

overall, Medrano's assertions are fact based and contained within the trial court records and its documents, as shown and discussed in this brief.

### P R A Y E R

WHEREFORE PREMISES CONSIDERED, Medrano prays this Honorable Court grants habeas relief, vacating the judgment and remands the case back to the trial court for further proceedings. So prayed.

Respectfully submitted,

Abel Medrano #1743611
Dalhart Unit TDCj
11950 FM 998
Dalhart, Texas 79022
Pro Se

### CERTIFICATE OF SERVICE

I, Abel Medrano, due hereby certify that a true and correct copy of the above and foregoing document was served on Larry Allison, Lampasas County District Attorney, P.O. Box 327, Lampasas, Texas 76550, on this the 18th day of May, 2015.

Same was deposited also on this 18th day of May, 2015, sent to the Clerk of the Texas Court of Criminal Appeals, at P.O. Box 12308, Capitol Station, Austin, Texas 78711, VIA U.S. Postal Mail Service, postage prepaid, first class.

Abel Medrano

EXHIBIT - A

ABel Mejrano #1746611
Dalhart unit TDCJ
11450 Fm 998
Dalhar TX

G1-09

7302276224E

AUSTIN TX 786
RIO GRANDE DISTRICT
20 APR 2015 PM 3 L

FOREVER USA

EXHIBIT - B

was on the news for and I did not know but it looked like the same guy and I remember he supposedly had a darker mark on one side of his face. When I saw Able I automatically thought of the picture on the news. Able never spoke to us and I never spoke to him. Eventually Able got up and left and Angela and I sat down and continued to talk to Ramon. We stayed at the end of the bar and talked all night. Albert Perez who was the DJ came over and spoke to us at times. We drank beer and shots of liquor. I had about 5 to 6 beers and about 3 shots of Yeager Bombs during the night. I do drink beer on weekends but seldom take shots because they usually make me sick, I don't handle them well.

At about 2:00 am, or closing time we decided to go home but, Angela wanted to go talk to Moses. I do not know Moses' last name but I know of him and know he is a friend of Angela. I think Moses was at Robert Castro house, but do not know whose house it is. I think Angela said it was Rob's house, which is Robert Castro. I was fine while in the bar and while leaving the bar. I never left my drink unattended and when I went to the restroom Angela watched my drink. We do this all the time, if we both go then we take our drinks with us. I rode with Angela to Robert's house and while on the way to Robert's house, I already started feeling bad. I knew I was not going to feel good, I remember having my eyes closed and was just laying their.

I know we turned up a road by Mr. Gattis' and then seems like we made a couple of other turns and parked in the front of Robert's house. I think we parked the wrong way, illegally in front of Robert's house. I remember telling Angela not to stay long and she said she was just going to be in there for a little bit. I was already starting to pass out. I don't remember a street light on. I know after she got out of the car I passed out. Angela shook me and said I will be right back. I was in the front passenger with the seat laid back and I know I had my seatbelt on when we left AmVets. I cannot tell you how long she was in there or her even really getting out of the car.

The next time I woke was when I heard Angela banging on the passenger side window and yelling my name. I also found Able on top of me. Able was more or less centered over me and I tried push back up into the rear of the seat to get out from under him. I don't know what was pinning my left leg down but I could not get out from under him. I know Angela walk away from the car and then returned. The doors unlocked. It all happened so fast, I started saying get off, let me out, and things like that, and then he got off me and left the car and went around the front of the car. Angela was at the passenger door and told me she would help me and got into the car and we left. I don't remember seeing him with his clothes on or off, I just can't remember. My legs were open and he was in between them with something over my left leg.

It was then I realized my shirt and bra were pulled up towards my neck exposing my breast, but neither were off my body. My heels (shoes), pants and panties were completely off my body. I remember hearing a man's voice and remember covering my lower body with my hands and arms. I remember putting my clothes on as we turned left around the first corner or street. I remember I felt wet in my vaginal area, the same kind of feeling I have felt after having sex. I found my clothes kind of over the center console area as if he tried to throw them to the driver's seat. I never found my panties and put my blue jeans pants on with out them. My missing panties were a fuchsia color with little blue dots, they were bought at Wal-Mart and I do not know the brand name. The were medium size and bikini cut style.

I know Angela took a side road back to AmVets where my car was. When we got to AmVets, I told Angela I did not want to drive home and she took me home to Burnet. We went straight to Burnet and did not talk about anything. Angela asked me if I was alright. I did not want to talk. I was not feeling sick because of the alcohol any more and was now feeling sick because of what happened. When I got out at my house, Angela told me to call her if I needed to talk. I told her I

E X H I B I T - C

what was being said. I then saw Abel walk around the back of the car and get in on the driver's side. Abel was in the car between the times Angela went to the restroom to the time she came back outside. Angela sat down for a minute and I think Moses told Angela something like "Check on your friend." Angela went down to her car and then I heard her start screaming, "Get the fuck out of my car." Then Angela yelled something like "Moses, get him the fuck out of my car." Moses went down there. I heard Moses say, "Primo, get the fuck out of the car, they are trying to leave." I think Abel got out of the passenger side door. Angela was at the driver's side door. Abel walked back up to the garage (carport) and did not say anything to me at all. Abel had his clothes on. Angela and Theresa left. Me and Abel went to another friend's house. The friend was Joseph. I don't know what Joseph's last name is. I don't know where exact Joseph lives but it is on the same side of town. We stayed there and ate at the Country Kitchen the next morning.

The next day, Moses told me that Theresa was missing $150 and something about sexual assault that she was going to make a complaint against Abel for sexual assault. I think it was the same day Moses called me about it, that Abel told me Theresa let him have sex with her. I told Abel if he did not do it he needed to go down and straighten it up, because he looked guilty by running.

Investigator Ryan asked me if I had seen any clothing lying around the area after they left. I did not see any clothing around. Abel has not said anything about it except, he did not do it. I believe him and think the girl just got embarrassed. I know Theresa too and feel bad for her if it did happen. I have nothing to hide or gain from this.

I have read this entire statement, consisting of 2 page(s), each of which bears my signature, and I affirm all the facts and statements contained here in are true and correct. Criminal Investigator Tim Ryan has read this entire 2 page statement aloud to me and I again confirm this statement is true and correct. I have given this statement freely and voluntarily to Investigator Ryan to use for whatever investigative purposes he may desire. This statement was given without any threats or promises having been made by anyone. I have completed 9 grades in school and have a GED. I read, write and understand the English language.

After taking the 2 page statement from Hernandez, I read it back to him aloud to assure that it was true and correct. Hernandez said it was true and correct and initialled and signed the statement indicating so. The original statement was attached to the case file as evidence.

(Case remains open)

---

**Supplement:** Ryan's #4 Supplement / Evidence

On October 16, 2009, I, Sergeant Investigator, Tim Ryan called Teresa Robles to talk to her about the case and to make sure she did not have any questions concerning her case. Robles told me, she had located her pants that she wore the night she was sexual assault. Robles said, she thought she had washed them, but located them in another dirt clothes hamper. She asked if I still wanted them and if so she would bring them to Lampasas after getting off work. I told Robles that I would be down in Burnet on the following Monday and could pick the pants up then, if she wanted. Robles said that would be fine and agreed that I would call her when I was in Burnet.

On October 19, 2009, at approximately 2:15 pm, I met with Robles in Burnet. Robles handed me the pair of pants she wore the night she was sexually assaulted. The pants were in a H.E.B. paper sack. I

took the pants back to the Lampasas police Department and completed an evidence tag and attached it to the sack, then placed the pants in the evidence room after being logged into evidence. The pants were never removed from the paper sack, so not to disturb any possible evidence on the pants.

(Case remains open)

**Supplement:** Ryan's #5 Supplement / Robert Castro

On Ocotber 21, 2009, at approximately 2:15 pm, I, Sergeant Investigator, Tim Ryan stopped by Roberts Castro's residence located at 306 North Porter to talk to him about the sexual assault reported to have occurred at or near his residence on the morning of October 10, 2009. Nobody was home and I left one of my business cards with a note asking for a return call.

Later that afternoon, I spoke with Patrol Corporal, Jase Herring and asked that during his shift, if he would stop by Castro's residence and talk to him about coming by the police department to talk to me about the incident. Corporal Herring said he would attempt to talk to Castro later in the evening.

On October 22, 2009, during the morning hours, I returned to Castro's residence and left another business card explaining that I needed to speak with him about the incident. The card I left the previous day was gone. Later in the day, Castro called me and said that he had gotten the card I left and stated he would come down and talk to me around 5:00 pm, if that was alright. I agreed to the time and told him I would be waiting for him.

At approximately 5:15 pm, I met with Robert castro in the police department lobby, then escorted him back to my office where I spoke to him about the incident and what he knew. After talking to Castro for awhile about it, I took the following statement from Castro.

## VOLUNTARY STATEMENT

My name is Roberto Castro. I live at 306 North Porter, Lampasas, Texas 76550. My home telephone 512-566-0412. My social security number is 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. My birth date is July 16, 1980. My Texas Driver's License Number is 17645113. I work for Randall Electric out of Bee Cave, Texas. I am giving this statement freely and voluntarily to Investigator Tim Ryan of the Lampasas Police Department. The date is October 22, 2009. The time is 5:41 pm.

On the night of October 9, 2009, at about 10:30 pm to 10:45 pm, I dropped Moses Loya off at the Lampasas AmVets. I decided to stay and visit until my girlfriend got off work at 11:30 pm, I figured I had a little time to mingle. When I got there my brother, Ramon, Chris Hernandez, Abel Medrano, Angela Walker, and girl I only know as Theresa were there. Abel, Moses, Chris, and I sat at a table, while Angela and Theresa sat on the far side of the bar with Ramon. They were on the side next to the pool tables. I know this because before I left I went over and talked with my brother, to make sure he is alright. I always do that. Ramon and the girls never came to the table we were at while I was there.

I think I was only there until about 12:15 am or 12:30 am, max. I left and went to my house and my girlfriend picked me up there and we went to her house. My girlfriend is Molly. I am really unsure of her last name because I have not known her that long. I stayed at her house until

E X H I B I T - D

(Case remains open)

---

**Supplement:** Bailey

On Monday, 10/26/2009 Sgt. Tim Ryan provided a copy of a bill from SANE Debbie Coats. I completed a reimbursement form to be submitted to the Attorney General's Office. This was presented to Kelli Sanguinet to be mailed with an itemized bill to the AG's office, once payment for the exam was made. No further information.

On 11/05/2009 I, Bailey, received from Chief Angermann check# 120936883 from the Texas Comptroller of Public Accounts for $366.00 for reimbursement for SANE.

This check was given to Carol Boberg with the City of Lampasas.

---

**Supplement:** Ryan's #6 Supplement / Warrant

On October 27, 2009, I, Sergeant Investigator Tim Ryan completed the necessary paperwork to obtain a Warrant of Arrest against Abel Medrano for Sexual Assault. The paperwork included a three page Probable Cause Affidavit for Warrant of Arrest, the written complaint, and the actual Warrant of Arrest Document. At approximately 10:25 am, I met with Lampasas Municipal Judge, Robert Gradel and presented the paperwork and case to him. After reviewing the paperwork and case, Judge Gradel signed the Warrant of Arrest against Medrano and assigned Cause Number 102709-A to the paperwork. I returned to the police department and turned the original warrant over to Data Entry Clerk, Kelly Sanguinet and asked that she enter Medrano into the Texas Criminal Information Center as a wanted person. At approximately 1:15 pm, Sanguinet did get Medrano entered into TCIC as a wanted person, and provided a copy of the paperwork confirming his entry.

(Case open pending warrant service)

---

**Supplement:** Ryan's #7 Supplement / Lab Submission

On October 30, 2009, upon arriving at work, I, Sergeant Investigator Tim Ryan completed a Texas department of Public Safety Crime Laboratory Service Laboratory Submission Form to submit the TX100 Sexual Assault Evidence Collection Kit, the four swabs Lieutenant Investigator Jody Cummings collected from Angela Walker's vehicle, and the dark blue denim pant Theresa Robles turned over to me, for processing and the hopes of finding evidental DNA. A copy of the Lab Submission Form was placed in the notebook for the form located int he evidence room.

At approximately 12:10 pm, I arrived at the Waco Crime Lab and submitted the evidence. In return I received a copy of the Lab Submission Form with a decal indicating it had been received. The lab tracking number was L6W-130683. This copy was added to the case file as evidence.

(Case remains open pending warrant service)

---

**Supplement:** Ryan's #8 Supplement / Warrant Service

Serveral months ago, Sergeant Investigator Charlie Boswell contacted U.S. Marshal Aaron Greenwood in an attempt to assist in locating Abel Medrano. On September 10, 2010, Marshal Greenwood had tracted Medrano to Dallas, Texas and further knew of his place of employment.

E X H I B I T - E



# TEXAS DEPARTMENT OF PUBLIC SA
## CRIME LABORATORY SERVICE
### Laboratory Submission Form

# L6W-130683

| | |
|---|---|
| Agency Case Number | 2009007816 |
| Offense | Sexual Assault |
| Date of Offense | 10/10/2009 |
| County of Offense | Lampasas |
| Agency | Lampasas Police Department |

**Received**
**10/30/09 12:17 PM**
Texas DPS Waco
Crime Laboratory

Date
Evidence Rec'd

## Case Contact Person

Name Tim Ryan

Title Sergeant Investigator

Mailing Address 301 East Fourth

Phone 512-556-3644     Fax 512-556-2838

City, State Zip Code Lampasas, Texas 76550

Email Address tryan@ci.lampasas.tx.us

| Suspect | Victim | Name (Last, First Middle) | Race | Sex | DOB | DL# / SS# / ID# |
|---|---|---|---|---|---|---|
| ☑ | ☐ | Medrano, Abel | W | M | 02/01/1974 | X DL 18307261, SSN 460-25-285 |
| ☐ | ☑ | Robles, Theresa Rene | W | F | 10/31/1975 | X DL 12594390, SSN 460-89-326 |
| ☐ | ☐ | | | | | |
| ☐ | ☐ | | | | | |

## Description of Evidence Submitted

| | Exhibit # | Number of Items | Description of Evidence | Origin | Exam Requested |
|---|---|---|---|---|---|
| 1 | 1 | 1 | TX100 Sexual Assault Evidence Collection Kit | Evidence taken from Victim / Robles | Process for DNA and find possible match. |
| 2 | 2 | 4 | Four swabs used to collect possible DNA evidence | Stain on front passenger seat where victim was passed out during sexual assault | Process for DNA and find possible match. |
| 3 | 3 | 1 | Dark blue denim jeans worned before and after sexaul assault occurred | From Victim / Robles | Process for DNA and find possible match. |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |

For some non-drug cases, it may be appropriate to attach a copy of the offense report.

Please include brief case synopsis, unusual examination(s) requested, and/or relevant case priority information.

Points of interest for this sexual assault case. Suspect / Medrano has not been located to arrest and therefore there are no DNA swabs taken from him however, he is a convicted felon and there may be DNA for him in CODIS. The jeans submitted were left as received and were worn after the sexual assault without underwear, which were never found.

Are known standards (blood, saliva, hair, inked prints, clothing, fabrics, etc.) submitted for comparison?  ☐ Yes  ☑ No

Have any of these exhibits been previously analyzed by a laboratory?  ☐ Yes  ☑ No  If so, What Exhibit #'s?

LAB-06 Rev.00 (11/2002)

E X H I B I T - F

Abel Medrano   #1743611
6999 Retrieve Rd., Scott Unit
Angleton, Texas   77515-6618



December 23, 2013

Lampasas County District Clerk
P. O. Box 327
Lampasas, Texas   76550

RE: Filing of MOTION FOR FORENSIC DNA TESTING in Cause No. 8602


Dear Clerk:

    Enclosed herein, please find the Original of my MOTION FOR FORENSIC DNA TESTING in the above referenced cause number. Please file it among the papers of this cause and bring it to the Court's attention on its first day of business after receipt hereof.

    Thank you for your time and attention in this matter. I will await your response herein.


Sincerely,

ABEL MEDRANO




c: files

CAUSE NO.  8602

EX PARTE                                      §          IN THE DISTRICT COURT OF

ABEL MEDRANO,                                 §          LAMPASAS  COUNTY,  TEXAS

Movant                                        §          27th  JUDICIAL  DISTRICT

## MOTION FOR FORENSIC DNA TESTING

TO THE HONORABLE JUDGE OF SAID COURT:

NOW  COMES,  Abel  Medrano,  Movant  herein,  and  respectfully  sibmnits  this motion  for  forensic  dna  testing  of  biological  material  current  in the posses- sion  of  the  State  of  Texas,  pursuant  to  Tex.Code Crim.proc. 64.01.  In support thereof,  Movant will show this Court as follows, to-wit:

### I.  BACKGROUND

Movant  was  indicted  in  Cause  No. 8602 for Sexual Assault; a jury found Movant  guilty  and  the  trial  court sentenced Movant to 35 years.  Movant filed a  timely  notice  of  appeal and the appeal was affirmed by the Third Court of Apeals.  A petition for discretionary review was refused by the Court of Crimi- nal Appeals.

### II.  CURRENT PROCEEDINGS

Movant  requests  testing of biological material of a pair of pants submit- ted  to  the  Texas  Department  of  Public Safety (TDPS) Crime Lab for testing but  which  were  not  tested  because the serologist testified he did not need to  test  the  pants because he had obtained a profile match to the semen found on  the  seat  of the car which matched Movant's DNA profile.  These pants were seaized  and  made a part of the sexual assault evidence collection kit in this

1

case.

Movant contends that those pants were not previously subjected to DNA testing, and that through no fault of Movant for reasons that are of a nature such that the interests of justice require DNA testing.

### III. REQUEST FOR APPOINTMENT OF COUNSEL

Pursuant to Art. 64.01(c), Movant requests the court appoint counsel in these proceedings because there exist reasonable grounds for such appointment because the material evidence requested to be tested would establish Movant did not have sexual intercourse with the complainant as she allegedly wore (or put back on) those pants immediately after the alleged sexual assault. The trial record supports this contention. Movant has attached an Affidavit in support as required by Art. 64.03(B)(a)(2)(A) & (B).

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Movant prays this Honorable Court will grant this motion and (a) appoint counsel and (b) ORDER DNA testing of the pants in questions herein; and grant any other relief, at law or in equity, and consistent with the relief requested herein.

RESPECTFULLY SUBMITTED,

ABEL MEDRANO #1743611
6999 RETRIEVE RD., WAYNE SCOTT UNIT
ANGLETON, TEXAS     77515-6618

Movant     Pro-Se

2

Cause No. 8602

| | | |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT OF |
| ABEL MEDRANO, | § | LAMPASAS COUNTY, TEXAS |
| AFFIANT | § | 27th JUDICIAL DISTRICT |

## AFFIDAVIT

I, Abel Medrano, being of sound mind, over the age of 18 years, and capable of making this affidavit, am personally acquainted with the facts related herein, do declare under penalty of perjury that:

"I would not have been convicted if exculpatory results had been obtained through DNA testing of the pants in the possession of the State of Texas; and,

"This request for DNA testing is not made to unnecessarily delay the execution of sentence or administration of justice;

"Affiant further contends that through no fault of his, the evidence was not tested for DNA biological evidence.

"Affiant further and unequivocally avers he is innocent of having committed a sexual assault upon the complainant.

"Further, Affiant sayeth not."

I, ABEL MEDRANO, BEING PRESENTLY INCARCERATED AT THE WAYNE SCOTT UNIT IN BRAZORIA COUNTY, TEXAS, DO DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE AND FOREGOING IS TRUE AND CORRECT.

EXECUTED ON December 23, 2013.

ABEL MEDRANO #1743611
6999 RETRIEVE RD., WAYNE SCOTT UNIT
ANGLETON, TEXAS 77515-6618

AFFIANT Pro-Se

EXHIBIT-G

# EVIDENCE RETURN RECORD

Laboratory Case Number: L6W-130683

Submitting Agency: Lampasas Police Department  Submitting Agency Case No.:2009007816

Package Description:

## Sexual Assault Kit
## White Paper Sack
## Paper Sack

RETURNED TO:    _CHARLIE BOSWELL_
                     (Printed Name)

                     _Officer's Signature_

RETURNED BY:    _____

                     ___EVIDENCE___
                     · AUG 1 2 2010
                     ___RETURNED___

DATE RETURNED:    ___Gur___

METHOD RETURNED:    _✓3_ Personally  _____ Certified Mail # _____

Notes:    DNA Side

EXHIBIT-H



# TEXAS DEPARTMENT OF PUBLIC SAFETY

**CRIME LABORATORY**
**1617 EAST CREST DRIVE**
**WACO, TEXAS 76705-1598**
**Voice 254-759-7180   Fax 254-759-7185**

### Serology\DNA Report

September 24, 2010



STEVEN C. McCRAW
DIRECTOR
LAMAR BECKWORTH
CHERYL MacBRIDE
DEPUTY DIRECTORS

COMMISSION
ALLAN B. POLUNSKY, CHAIR
C. TOM CLOWE, JR.
ADA BROWN
JOHN STEEN
CARIN MARCY BARTH

Sgt. Inv. Tim Ryan
Lampasas Police Department
301 E. 4th
Lampasas, Texas 76550

| Laboratory Case Number | Agency Case Number | Offense Date |
|---|---|---|
| L6W-130683 | 2009007816 | 10/10/09 |



**MEDRANO, Abel**

**Victim(s)**
ROBLES, Theresa Rene

**Offense:** Sexual Assault
**County of Offense:** Lampasas (141)

## Evidence Submitted

In person by Tim Ryan on October 30, 2009:

- Item 1     Sexual assault kit from Theresa Robles containing:
  - 1A     Blood sample
  - 1B     Vaginal swabs
  - 1C     Vaginal smear
  - 1D     Oral swabs
  - 1E     Oral smear
  - 1F     Fingernail scrapings
  - 1G     Buccal swabs
- Item 2     Swabs from vehicle
- Item 3     Jeans

## Requested Analysis

• Determine the presence and STR DNA profile of biological evidence
• Enter profiles into the Combined DNA Index System (CODIS)

## Results of Analysis and Interpretation

Semen was detected on two swabs from the vehicle (2A & 2C).

A presumptive test for semen was positive on the remaining two swabs from the vehicle (2B & 2D).

Semen was not detected on the vaginal swabs or the oral swabs.

Items 1A, 1C, 1E, 1F, and 3 were not examined.

A portion of the victim's buccal swabs was extracted by a method that recovers DNA from nucleated cells.

Swabs 2A and 2C from the vehicle were extracted by a two-step method that will first recover the DNA of non-sperm nucleated cells (epithelial fraction), and then recover the DNA of sperm cells (sperm fraction).

*ACCREDITED BY THE AMERICAN SOCIETY OF CRIME LABORATORY DIRECTORS – LAB ACCREDITATION BOARD*
COURTESY – SERVICE - PROTECTION

E X H I B I T - I

# STEP 1 REQUEST FOR MEDICAL FORNESIC EXAMINATION, TREATMENT, COLLECTION OF EVIDENCE, AND RELEASE OF MEDICAL RECORDS

I hereby authorize _Debbie Garza_ , a representative of _Llano Hospital_

(Name of Examiner)                                    (Name of Hospital)

to perform a medical forensic examination, treatment and the collection of evidence. I further permit the photographic documentation and release of copies of the complete report to the law enforcement agency.

I release_____Llano Hospital_____ and its representatives from legal responsibility or liability for

(Name of Hospital)

the release of this information.

X _Theresa Renee Robles_                          _Debbie RN_

Signature of Patient (parent or guardian)         Signature of Witness

Note: If the parent or guardian is not available for signature, child may be examined for sexual abuse under Texas Family
Code.

Pt Name: Theresa Robles___
Law Enforcement Agency: _Lampasas PD__ Case # _2009-00-7816__
Date of Examination: _10-13-09__

## STEP 2     SEXUAL ASSAULT EXAMINATION FORENSIC REPORT FORM

Please print legibly. To be filled out with medical information gathered from the patient. Please inform the patient that, should the case go to court, it may be necessary to gather additional evidence at a later time. Please fill all spaces with information or N/A.

Name: Theresa Robles_____     DOB: 10-31-75_____     Sex: female_____     Race: Hisp_____
Address: 403 E Pecan 'St Burnet Tx. 78611_____     Phone: 512-762-0222_____
Patient brought in by: Self_____ Agency or Relationship of Escort: Family Crisis center, Donna___
Hospital or Advocacy Center Number: 1057745_____     Law Enforcement Case Number: 2009-00-7816_____
Exam Date: 10-13-09_____     Beginning Time of Exam: 0045_____
Vital Signs: Time: not taken_____     Temp: _____     Pulse: _____     Resp: _____     B/P: _____
Known Allergies: NKDA_____
Current Medications: None_____

HISTORY OF ASSAULT: (Patient's description of pertinent details of the assault – if known by patient, such as: orifice penetrated, digital penetration or use of foreign object, oral contact by assailant, oral contact by patient)
Patient asked to tell why she was here today for an exam? Patient states" I was with my friend Angela in Lampasas on friday night.early Sat. morning about 2:00am, I had a lot to drink and I was tired and my friend wanted to go see some friends so I stayed in the car, by the time we got there I was passed out, Angela locked the car and went in the house, after just a little while the next thing I remember is Angela screaming my name wanting telling me to open the door when I woke up this guy was on top of me, I was in the passenger seat and he was on top of me, my shirt and bra was up around my neck and my pants and shoes were off, I could not get him off of me, he was big and I could not move him, I tried to push out from under him and I could not I was just screaming, Angela went in to get keys and when she came out he was outside pulling his pants up, and left, his name is Able Madrano/Angela got in the car and drove me around the block and stopped and helped me get dressed, she wanted me to go to Hospital and I did not want to, I made her take me home, I showered and brushed my teeth, when I showered I noticed that it hurt down there and also that my knees were scraped and bruised, it also burns down there when I pee."_____

Date of Assault: 10-10-09_____ Time of Assault: 0200_____     Number of Assailants: 1_____
Prior to evidence collection, patient has:
☐Douched     ☒Wiped / Washed     ☒Bathed     ☒Showered     ☒Urinated     ☒Defecated     ☐Vomited
☒Had Food or Drink     ☒Brushed Teeth or Used Mouthwash     ☒Changed Clothes     ☐Smoked     ☐Other_____ ☐
None of the Above

**At time of assault, was:**
Contraceptive foam or spermicide present:?     ☐Yes ☐No ☒Unknown
Lubricant used by assailant?     ☐Yes ☐No ☒Unknown
What Kind?
Condom used by assailant?     ☐Yes ☐No ☒Unknown
Tampon present during assault?     ☐Yes ☒No ☐Unknown
Patient menstruating?     ☐Yes ☒No ☐Unknown
Assailant injured during assault?     ☐Yes ☐No ☒Unknown
If known, where? _____
Was there penetration?     ☐Oral ☒Female Sexual Organ ☐Anus ☐Unknown
Did ejaculation occur     ☐Oral ☐Female Sexual Organ ☐Anus ☒Unknown
Did ejaculation occur?     ☒Other noted stains on car seat and clothes_____

At time of exam, was tampon present?     ☐Yes ☒No
Menstruation at time of exam?     ☐Yes ☒No
When was the patient's most recent sexual contact with a male up to 1 week prior to the assault? 10-04-09_____
Race of that individual? Hisp_____

If the response is less than 48 hours, inform the patient of the possibility that blood and fluid samples may be requested from that individual at a later time.

_____
Signature of Examiner

I - 2

# STEP 2    SEXUAL ASSAULT FORENSIC EXAMINATION
Page 2

**Significant Past Medical History:**
Last normal menstrual period: 09-16-09 _____      Vaginal tampons used in past? yes _____
Contraceptives used: condoms _____
Genital surgical procedures: None _____
**General Appearance:** (behavior, affect) quiet talking crying at times, holding face in hands. _____
**Body Surface Injuries:** (Include all details of trauma i.e., abrasions, bite marks)
☐No body surface injuries noted.
see body diagram, many unexplained bruises and point tenderness _____

**Body Surface Diagrams:** Document injuries and observations on the attached body diagrams.
**Genital Examination:**                    Tanner Stage ☐1      ☐2      ☐3      ☒4      ☐5
Labia Majora No Trauma Noted _____
Labia Minora No Trauma Noted _____
Hymen 1/2 cm abrasion note at 4 O'clock _____
Vagina heavy discharge noted _____
Cervix No Trauma NOted _____
Perineum No Trauma NOted _____
Anus No Trauma Noted _____
Penis N/A _____
Scrotum N/a _____
Check for Sperm   ☒Not Done
**Genital Diagrams:** Document all diagnostic tests and treatment on medical record.
**Ending Time of Exam:** 0150 _____
**Impressions From Exam:** Sexual Assault by history, physical and genital trauma noted. _____

_____
Signature of Examiner

Ⅱ - 3

# STEP 2  SEXUAL ASSAULT FORENSIC EXAMINATION
Page 3

## EVIDENCE ITEMS INCLUDED IN KIT

☒Oral Swabs (4)
☒Oral Smear (1)
☒Vaginal Swabs (4)
☒Vaginal Smear (1)
☐ Dried Body Fluids
☐ Pubic Hair Combings & Comb
☐Pulled Pubic Hair Standards
☐ Anal Swabs (4)
☐Anal Smear (1)

☐External Penile Swabs (2)
☐External Penile Smear (1)
☒Saliva Swabs (2)
☒Purple Blood Tube
☐Red Blood Tube
☐Tampon, diaper, sanitary pad, sponge
☐Panties (if they fit in box)
☐Other _____

☒Fingernail Scrapings
☐Head Hair Combings & Comb
☐Pulled Head Hair Standards
☐Foreign Matter

## EVIDENCE ITEMS NOT INCLUDED IN KIT

_____# of paper bags   ☒ Photographs ☐ X-Rays     ☐Other _____ (Specify)

(Please list clothing or miscellaneous items)

| Article | Description (tears or stains) |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

## PATIENT FOLLOW-UP CARE / LEGAL CHECKLIST:

GYN/Medical/STD follow-up appointment — ☒Yes ☐No
Sexual assault counseling referral given — ☒Yes ☐No
Written and verbal information given to patient — ☒Yes ☐No
Medical Facility received permission to contact patient ☒by telephone  ☐by mail   ☐permission not obtained
Authorization for Release of Evidence to Law Enforcement Agency completed — ☒Yes ☐No
Law Enforcement / Children's Protective Services notified if suspect child abuse — ☒Yes ☐No

Debbie Coats, RN, CA-CP SANE_____
Printed Name of Examiner

Signature of Examiner

I - 4

## BODY DIAGRAMS

**STEP 2**





Signature of Examiner

I – 5

2009007816

**STEP 2**

# BODY DIAGRAMS

- 1x1cm
ider, reddish
rple bruise

Tender 2-
1 cm reddish
purple bruises

PT

PT

4x5cm
raised tender
abrasion and
surrounding
bruise

PT
O

0   1x1cm
tender red bruise

1x2cm
purple bruise

1x3cm
purple bruise

2x2cm
bruise

2x3cm
red bruise

Abrasion

2x3cm
reddish
bruise

P.T.

Signature of Examiner

I - 6

**STEP 15**   **RECEIPT OF INFORMATION**

I have received the following items (check those which apply):

☒One sealed evidence kit
☐# of sealed clothing bag(s)
☐X-rays or copies of X-rays
☐Photographs
☒Other Written Report_____

Name of person releasing articles:

| Signature | Printed Name | Date | Time |
|---|---|---|---|

Received by:

| | Tim RYAN | 10-14-09 | 1:38Pm |
|---|---|---|---|
| Signature | Printed Name | Date | Time |

| 104 | LAMPASAS P.D | | |
|---|---|---|---|
| ID Badge# | Agency | | |

Signature of Examiner

I - 7

# STEP 16     AUTHORIZATION FOR EXAMINATION AND PAYMENT

I hereby authorize Debbie Coats, RN, CA/CP SANE (facility) to perform a sexual examination and request payment for this forensic evidence examination from the law enforcement jurisdiction to which the crime was reported.

Theresa Robles
Printed Name of Patient

10-13-09
Date of Examination

Case # 2009-00-7816

Note: Once form is signed, it should be sent to the law enforcement jurisdiction of authorization of payment.

Lampasas PD
Law Enforcement Agency

Authorized Signature of Law Enforcement

10-14-09
Date

1:38 Pm
Time

LAMPASAS P.O.
Printed Name of Law Enforcement

*Note:  Please return this form to the facility within 10 days.  Texas Civil Statute article 444471 requires that law enforcement agencies pay for evidence collection examinations in the case of reported sexual assault.*

E X H I B I T - J

Cause No. 8602

| | | |
|---|---|---|
| Ex Parte | ^ | IN THE 27TH DISTRICT COURT |
| ABEL MEDRANO | ^ | OF |
| Movant | ^ | LAMPASAS COUNTY, TEXAS |

## STATE'S RESPONSE TO MOVANT'S REQUEST FOR DNA TESTING

TO THE HONORABLE JUDGE OF SAID;

NOW COMES, the State of Texas, by her County Attorney and respectfully submits this Response to the Movant's request for DNA testing.

### I.

Section 64.03 of the Code of Criminal Procedure states that the Convicting Court "may" order DNA testing under this chapter only if (a)(1)(B).(among other things) ..and...identity was or is an issue in the case.

Movant argues that DNA testing of the pants that the victim was wearing at the time of the sexual assault would show that penetration of the sexual organ of the victim could not have occurred. This argument by the Movant is totally without merit. Identity was not an issue in the case tried to a jury in this cause and Movant does not argue this point in this Motion. Movant was observed by independent witnesses hovering over the victim in the front passenger seat of an automobile making thrusting movements as if having sex. Evidence was collected from that passenger seat which DNA testing showed was seminal fluid of the Movant.

### II.

In the trial of the case, the victim testified she was under the influence of alcohol at



the time of the assault and was not fully conscious and aware of her surroundings and had passed out in the front passenger seat of her friend's automobile. Upon becoming aware and conscious of her surroundings, she found that her clothes had been removed from her waist down. Her pants were found in the automobile but her panties were not found. After the assault and as her friend was driving, she felt wet in her vaginal area. She testified she later experienced pain in her vaginal area and that she experienced pain when she urinated. The victim testified that she had been penetrated based upon what she had experienced.

Movant is attempting to use this avenue to argue facts that have already been determined by the jury and that is the credibility of the victim and her testimony about whether or not penetration had occurred as a result of the assault by the Movant.

Furthermore, the Movant has not established by a preponderance of the evidence, as required by 64.03(a)(2), that additional evidence of DNA from the pants would have caused a different result than the guilty verdict.

<u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, the State would pray that the Movant's Motion be denied.

RESPECTFULLY SUBMITTED:

Larry Allison, County Attorney
409 So. Pecan St.
P. O. Box 1300
Lampasas, Texas 76550
SBN: 01090700
Ph; 512-556-8282
Fx: 512-556-4572

EXHIBIT-K



**Larry W. Allison**
*County Attorney (with felony responsibility)*

**John K. Greenwood**
*Assistant County Attorney*

**Holli Schaub**
*Witness Coordinator*

**Kristin Evans**
*Legal Secretary*

**Trina Hudson**
*Legal Assistant*

March 24, 2011

Kurt Corley
Attorney at Law
104 Park Trail Dr.
Marble Falls, TX 78654

RE: Able Madrano, Case No. 8602

Kurt;

Enclosed you will find a copy of the Affidavit and Search Warrant that was issued by Judge Phillip Ziegler, retired District Judge from Coryell County. He has been sitting on a case here by assignment on a jury trial and agreed to review the affidavit and signed the warrant. Pursuant to that, a buccal swab was taken by Sgt. Tim Ryan of the Lampasas Police Dept. on this date from Mr. Medrano for comparison with their recovered DNA at the DPS lab in Waco, Texas. In addition to the swab, a blood draw was taken pursuant to the first Court Order to determine whether or not Mr. Medrano has HIV or AIDS or any sexually transmitted disease.

Please let me know if you need anything else from me at this time and feel free to inspect our file if you see the need. Thanks.

Yours truly,

Larry Allison

LWA/rp

THE STATE OF TEXAS

COUNTY OF LAMPASAS

## AFFIDAVIT FOR SEARCH WARRANT FOR BLOOD

Before me the undersigned authority, on this day personally appeared
_____ , your affiant herein, who after
being by me duly sworn stated under oath the following;

I.

I am a peace officer of the State of Texas, in Lampasas County, and I have good reason to believe and do believe that heretofore, on or about the 10th of October, 2009 in the County of Lampasas and State of Texas, Abel Medrano whose date of birth is 2/11/1974 did then and there commit the offense of sexual assault against an individual who is identified, for purposes of this case, as Lisa Jo Evans, the victim. This offense was reported to your affiant who has been involved in the investigation of this offense.

The victim reports to your affiant through her written statement that she knows Abel Medrano through mutual friends. In the early morning hours of October the 10th, 2009, after having consumed alcoholic beverages, Ms. Evans reports that she became sleepy and at times unconscious. She was riding with a friend of hers in the front passenger seat of her friend's vehicle. Ms. Evans reports that she was aware that her friend drove to someone's house in Lampasas and left her in the car as her friend went to talk to someone at this residence.

Ms. Evans reports that the alcohol was causing her to pass in and out of consciousness and upon awakening at one point, found Abel Medrano on top of her in the front passenger seat. She reports that her legs were open and Abel Medrano was between her legs. As she continued to struggle, Abel Medrano got up off of her and left the car with her still in the passenger seat. Upon Abel Medrano leaving her in the vehicle, she discovered that her pants and underwear had been removed. Ms. Evans reports that later that day she observed bruising on her legs and experienced a burning sensation when she bathed her vaginal area and when she urinated.

II.

On October 12, 2009, your affiant made an inspection of the subject vehicle and especially the front passenger seat where the victim reports she was assaulted. Your affiant found what appeared to be stains consistent with body fluids on the edge of the passenger seat where the victim was seated and where the penetration of the victim's sexual organ would have taken place. Your affiant has collected samples from this area of the front passenger seat that has been analyzed by the Waco DPS Laboratory to determine the presence of any identifying fluid. The DPS laboratory has reported to your affiant that the collected samples from this stated area of the front passenger seat contain male DNA.

Ms. Evans was examined by a Sexual Assault Nurse Examiner on the 13th of October, 2009 and the examiner observed injuries to the person of Ms. Evans consistent with being sexually assaulted. Your affiant has reviewed this written report by the Nurse Examiner which documented the findings of the bruising to Ms. Evans legs and trauma to her sexual organ.

FILED

MAR 2 4 2011

TERRI COX
District Court, Lampasas County, TX
By_____ Deputy

## III.

Since the victim has identified Abel Medrano as the person who assaulted her in the front seat of her friend's car. Your affiant has reason to believe that a blood sample or buccal swab of Abel Medrano will show that he was in fact the person who was sexually assaulting the victim, Ms. Evans. This requested material will constitute evidence of the offense of sexual assault by Abel Medrano through further DNA testing by the laboratory. Abel Medrano is in possession of these body fluids that your affiant herein asks for permission to acquire.

WHEREFORE, your affiant requests that a warrant to search for and seize blood or a buccal swab from the person of the said Abel Medrano be issued in accordance with the law in such cases provided.

_____
Affiant

SUBSCRIBED TO AND SWORN to before me by _____ Jody Cummings _____ on this the _____ 03/33 _____, 2011.

_____
Judge Presiding

27th District Court
Court

By Assignment

THE STATE OF TEXAS § IN THE _2)<sup>TH</sup> district_
COURT OF
COUNTY OF LAMPASAS § LAMPASAS COUNTY, TEXAS

# SEARCH WARRANT
## {Article 18.02(10), Texas Code of Criminal Procedure}

The State of Texas: To the Sheriff or any Peace Officer of LAMPASAS County, Texas, or any Peace Officer of the State of Texas:

Whereas, the affiant whose name appears on the affidavit attached hereto is a peace officer under the laws of Texas and did heretofore this day subscribe and swear to said affidavit before me (which said affidavit is here now made a part hereof for all purposes and incorporated herein as if written verbatim within the confines of this Warrant), and whereas I find that the verified facts stated by affiant in said affidavit show that affiant has probable cause for the belief he/she expresses herein and establishes existence of proper grounds for issuance of this Warrant;

Now, Therefore, you are commanded to enter the suspected place, vehicles, and premises described in said affidavit, to-wit: **THE BODY OF ABEL MEDRANO; a WHITE MALE, with a Date of Birth of 02/11/1974, Brown Eyes, Social Security Number 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, currently in the custody of the Sheriff of Lampasas County, Texas.**

At said places you shall search for and, if same be found, seize and bring before me the property described in the affidavit, to-wit: A known sample of ABEL MEDRANO'S DNA by collecting a cheek swabbing, and/or blood sample. The Peace Officer colleting said known sample may enlist the aid of medical or other personnel.

Herein fail not, but have you then and there this Warrant within three days, exclusive of the day of its execution, with your return thereon, showing how you have executed same.

Issued this the ___23RD___ day of _March_, _2011_, at _____ o'clock __/__.M. to certify which witness my hand this day.

_____
MAGISTRATE, LAMPASAS COUNTY, TEXAS

**OFFICERS RETURN ON SEARCH WARRANT FOR BLOOD FROM THE PERSON OF ABEL MEDRANO;**

This search warrant for blood from Abel Medrano came to hand on the _23RD_ day of March, 2011 and was executed on the _24TH_ day of March, 2011 by taking Abel Medrano to a proper place to retrieve the body fluid sample as directed herein and same was collected under proper procedures from the person of Abel Medrano in the presence of ___Tim Ryan___ a law enforcement officer and said sample was delivered to the said law enforcement officer.

**FILED**
a.m. _3:55_ p.m. o'clock

MAR 2 4 2011

TERRI COX
District Court, Lampasas County
by _____ Depu.

_____
Officer Executing Warrant

EXHIBIT-L

The next day Angela text me and I called her back and asked her what was going on. She said Theresa was upset about the whole situation. Angela did not say Theresa was raped, but said Abel forced himself on her and stole money from her. I expected Abel to steal but never to rape anybody. I told Angela that her friend needed to do what ever she felt was right and if Abel did wrong he needs to be dealt with. I know my friends are not the best people but raping a girl is not right, not that steal is right but the rape is wrong.

I cannot say when I saw Abel putting his pants if he had an erection or not, I was really not trying to look at another guy. Also at no time during the night did Abel mention anything sexual about.

I have read this entire statement, consisting of 3 page(s), each of which bears my signature, and I affirm all the facts and statements contained here in are true and correct. Criminal Investigator Tim Ryan has read this entire 3 page statement aloud to me and I again confirm this statement is true and correct. I have given this statement freely and voluntarily to Investigator Ryan to use for whatever investigative purposes he may desire. This statement was given without any threats or promises having been made by anyone. I have completed 10 grades in school. I read, write and understand the English language.

After taking the statement from Loya, I read it back to him to assure it was true and correct. Loya said it was correct. I printed the statement and presented it to Loya to read and then initial and sign. After reviewing the statement, Loya did initial and sign the original 3 page statement as being true and correct. The statement was then attached to the case file as evidence.

On October 14, 2009, at approximately 1:15 pm, I arrived at the Llano Hospital and met with Sexual Assault Nurse Examiner, Debbie Coats to pick up the S.A.N.E. Kit. Nurse Coats made a copy of the eight pages pertaining to the sexual assault report, and an invoice for the services. The eight copies included a page titled Step 1, Request for Medical Forensic Examination, Treatment, Collection of Evidence, and Release of Medical Records; five pages titled Step 2, Page 1, Sexual Assault Examination Forensic Report Form, Page2, Sexual Assault Forensic Examination, Page 3, Sexual Assault Forensic Examination, and two pages of Body Diagrams; Step 15, Receipt of Information; Step 16, Authorization for Examination and Payment. Nurse Coats noted Robles had a 1/2 cm abrasion note at 4 O'clock, and physical and genital trauma noted, as well as many unexpalined bruises and point tenderness on Robles' body.

I returned to the police department with the S.A.N.E. Kit and submitted it as evidence in the evidence room. The eight pages of paperwork were attached to the case file as evidence.

On October 14, 2009, at approximately 3:00 pm, I visited with Lampasas County Attorney (with felony jurisdiction) Larry Allison about this case and explained to him what was know so far. I also discussed what I planned on doing in the future with the case. Allison agreed with my plans and told me there was enough to get a warrant against Abel Medrano for Sexual Assault and suggested I start in that direction.

(Case remains open)

**Supplement:** Ryan's #3 Supplement / Hernandez

On October 15, 2009, at approximately 11:35 am, Lampasas Police Dispatcher, Christy Fields called

EXHIBIT - M

me, Sergeant Investigator, Tim Ryan and informed me that Chris Hernandez was at the police department wanting to talk to me. I returned to the police department and met with Hernandez in the police department lobby. I escorted Hernandez to my office, where we talked about the events that occurred on the night of October 9, 2009 and the early morning of October 10, 2009. After talking to Hernandez, I took the following statement from him reflecting what he knew of the incident.

## VOLUNTARY STATEMENT

My name is Christopher Cortez Hernandez . I live at 201 Northington Street. My home telephone 512-566-0354. My social security number is 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. My birth date is April 9, 1975. My Texas ID Number is 08116552. I am giving this statement freely and voluntarily to Investigator Tim Ryan of the Lampasas Police Department. The date is October 15, 2009. The time is 12:10 pm.

On Friday, October 9, 2009, I called Robert Castro and talked to him about going to AmVets to drink and talk later in the night. I think I called Robert right after work. Later in the night Robert picked me up and we got to AmVets at about 11:00 pm to 11:30 pm. Robert and I sat a table by ourselves and drank beer. While sitting at the table, Ramon came over and paid me back $20 I loaned him earlier. I asked him where he was sitting and he said, he was over there chilling with Angela and Theresa. I know both Angela Walker and Theresa Robles and have known them since they were teenagers. I have known Angela a little longer. Ramon, Angela, and Theresa were on the pool table side of the bar and I could not see them because of the liquor bottles. After giving my money Ramon, went back to chill with Angela and Theresa.

I think Abel Medrano and Moses Loya came over and sat with me and Robert, but I can't tell you what time that was. Closer to closing time, Ramon, Angela, and Theresa came over and joined us. We sat there for a little bit. Nobody at the table seemed to be real drunk and we all just talked, everybody knew what was going on. Robert was the first to leave and never came back. Moses and Abel went outside to try to get a ride because they did not have one since Robert left. I think they got a ride with Angela and Theresa to Robert's house up by the cemetery. It is a green house. I stayed at the bar for a few more minutes after everybody left. I got a ride to Robert's house with a girl I know as Julia and I think her last name is Lane. Julia dropped me off at Robert's house and left.

At Robert's house, Moses, Abel, Angela, and I were in the carport. Robert was inside and never came out until the yelling started. Theresa was down in the Angela's car. I think somebody mentioned it but I don't know how I knew that. I do know that she has been over before and sat in the car before. We were drinking beer, probably about one a piece when Angela got up and said she was going to use the restroom and went inside. I think she stayed inside no more than ten minutes max. I really did not keep up with time the whole night.

A little bit after Angela went inside to use the restroom, Abel got up and said he was going to go down and holler at Theresa. I knew then Theresa was for sure in Angela's car parked down on the street. I could see the car from where I was sitting in the carport, because I was out towards the end. I know that Robert's truck and a small car will fit in his driveway, and then Angela's car was 10 to 15 foot down the curb away from me.

I watched Abel go down to Angela's car and go to the passenger side door. I don't know if he knocked or what but the light inside the car came on while Abel was at the passenger side door. With the light on I could see Abel face and could tell he was talking to her, but could not hear

what was being said. I then saw Abel walk around the back of the car and get in on the driver's side. Abel was in the car between the times Angela went to the restroom to the time she came back outside. Angela sat down for a minute and I think Moses told Angela something like "Check on your friend." Angela went down to her car and then I heard her start screaming, "Get the fuck out of my car." Then Angela yelled something like "Moses, get him the fuck out of my car." Moses went down there. I heard Moses say, "Primo, get the fuck out of the car, they are trying to leave." I think Abel got out of the passenger side door. Angela was at the driver's side door. Abel walked back up to the garage (carport) and did not say anything to me at all. Abel had his clothes on. Angela and Theresa left. Me and Abel went to another friend's house. The friend was Joseph. I don't know what Joseph's last name is. I don't know where exact Joseph lives but it is on the same side of town. We stayed there and ate at the Country Kitchen the next morning.

The next day, Moses told me that Theresa was missing $150 and something about sexual assault that she was going to make a complaint against Abel for sexual assault. I think it was the same day Moses called me about it, that Abel told me Theresa let him have sex with her. I told Abel if he did not do it he needed to go down and straighten it up, because he looked guilty by running.

Investigator Ryan asked me if I had seen any clothing lying around the area after they left. I did not see any clothing around. Abel has not said anything about it except, he did not do it. I believe him and think the girl just got embarrassed. I know Theresa too and feel bad for her if it did happen. I have nothing to hide or gain from this.

I have read this entire statement, consisting of 2 page(s), each of which bears my signature, and I affirm all the facts and statements contained here in are true and correct. Criminal Investigator Tim Ryan has read this entire 2 page statement aloud to me and I again confirm this statement is true and correct. I have given this statement freely and voluntarily to Investigator Ryan to use for whatever investigative purposes he may desire. This statement was given without any threats or promises having been made by anyone. I have completed 9grades in school and have a GED. I read, write and understand the English language.

After taking the 2 page statement from Hernandez, I read it back to him aloud to assure that it was true and correct. Hernandez said it was true and correct and initialled and signed the statement indicating so. The original statement was attached to the case file as evidence.

(Case remains open)

| Supplement: Ryan's #4 Supplement / Evidence |
| --- |

On October 16, 2009, I, Sergeant Investigator, Tim Ryan called Teresa Robles to talk to her about the case and to make sure she did not have any questions concerning her case. Robles told me, she had located her pants that she wore the night she was sexual assault. Robles said, she thought she had washed them, but located them in another dirt clothes hamper. She asked if I still wanted them and if so she would bring them to Lampasas after getting off work. I told Robles that I would be down in Burnet on the following Monday and could pick the pants up then, if she wanted. Robles said that would be fine and agreed that I would call her when I was in Burnet.

On October 19, 2009, at approximately 2:15 pm, I met with Robles in Burnet. Robles handed me the pair of pants she wore the night she was sexually assaulted. The pants were in a H.E.B. paper sack. I

EXHIBIT - N

guy they call big Chris was in the car port. Moses Loya, Abel and I walked in. There were all ready chairs sitting around. There was beer. Some one gave me one, but I don't remember who gave it to me. I remember at least two times Able asking me where my friend was, and telling me to go get her. I told him that she was passed out. I remember Abel sitting on the stairs that go up into the house from the car port. I had to go to the rest room. He got up for me to go into the house. I took me a minute. Robert was in the house when I went in. When I came back out of the house and into the carport, Moses said that I needed to go check on my friend. I went out towards my car to check on Theresa. From the end of the car port, I saw the light on in my car and I could see Abel on top of Theresa in the front, passenger's seat. I don't have tinted windows. I walked towards my car, and when I got to my car, I kicked my car and yelled for him to get out. The interior light had gone off I guess as I was walking out there. I tried to open the front, passenger's door. I remember the interior light coming back on and at the same time I saw Able fall off of Theresa and towards the steering wheel. At that point I saw that Able' pants were around his ankles and not completely off. I could see that his under wear was down. Able's a big guy, and fat. My car's small. I don't recall seeing his reproductive parts, meaning his penis. I can't say for sure if he was or had penetrated Theresa. I do know that at one point as I approached the car I saw Abel thrusting him self on top of Theresa, but I don't remember if it was before or after I kicked the car, before of after I tried to open the door, or if the interior light was on or off. I was yelling for Moses to get him out of my car. I'd gone around to the driver's door. Moses come down to my car from the car port. Moses had gone around to get Able out of the car. I was scared. I don't really know Able well at all. I don't remember exactly how Able got out of my car and I don't remember how the passenger's door got shut. I just know that as soon as I could I was in my driver's seat and was driving away. I drove towards the cemetery, and made a right on to the next street that's right by the entrance. I pulled over and started talking to Theresa. She had one hand down over her crotch in a fist and the other one over her mouth in a fist. She was leaning towards her door with her left leg crossed over her right. I could see her hip facing me and could tell her pants were completely off and she did not have any under wear on. She was crying. I noticed at that time her pants were pushed up under the dash in the floor board. I started trying to help her get her pants pulled back up. I never saw her under wear. Her shoes were completely off. They were shoes with heals. I don't recall exactly what they looked like. I was asking her things like what had happened and if she was OK. I was telling her that she needed to go to the police. She kept saying no, and crying. She finally said that she just wanted to go home. She'd gotten her pants back on. I remember that her shirt was on when I'd first approached my car when Able was on top of her, and it was on when I'd pulled over. I drove back towards Key Avenue. I drove to Am Vets where her car was at. I told her that I'd take her to Burnet, or she could go to Round Rock with me. She wanted to go home. Theresa got out of my car. When she did, I noticed what looked like a wet spot in my seat. I believe it was Sunday that I put a T-shirt over it, and left it there. Theresa got into her car, and I followed her to Burnet. She drove her car by her self and I drove mine by my self. When we got to Burnet, she made a right before we got to Storm's restaurant. I don't know where she went. I know she's living with her mother right now, but I don't think he mother lives in that area. I kept going on 281 and made a left on Highway 29 and drove to Round Rock. I did not talk to Theresa by phone during the drive from Burnet to Lampasas, or as I drove on to Round Rock. I spoke with Moses the next day, Saturday. He and I talk regularly, by phone. I don't remember exactly how the conversation got to what had happened the night before, but Moses asked about Theresa, if she was all right, and if she was going to the police. I didn't want to tell him much, and didn't, because I didn't know what Theresa was going to do. But,

EXHIBIT-O

My name is Moses Ayala Loya, Jr.. I live at 417 PR 4456, Kempner, Texas 76539. My home telephone 512-525-7216. My social security number is 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. My birth date is July 30, 1977. My Texas ID Number is 24491880. I am giving this statement freely and voluntarily to Investigator Tim Ryan of the Lampasas Police Department. The date is October 13, 2009. The time is 5:10 pm.

On October 9, 2009, at approximately 11:00 pm to 12:00 midnight, Robert Castro dropped me off at the Lampasas AmVets. I went down there to have a beer. I walk in and sat at a table by myself. I notice my nephew, Robert Resa was there and talked to him a little while. I also noticed Ramon Castro, Abel Medrano, Angela Walker, and Theresa Robles were sitting on the opposite side of the bar. Abel was even sitting on the opposite end of the girls. After a while Abel saw me and said, "You weren't going to tell me you were here?" I said. No just playing around. Abel and my nephew joined me and we sat and talked. Later in the night about 10 or 15 minutes before closing Ramon, Angela, and Theresa came over and sat down with us. We talked just for a little bit.

Once the they kicked the lights on, I went outside to wait on my ride, then Abel came out. Shortly afterwards Theresa, Angela, and Ramon came. Angela said, "Awh, do ya'll need a ride?" Abel and I accepted the ride. Angela drove her car, Theresa sat in the front passenger seat, and Abel and I got in the back seat. I did not say much because Abel, Angela, and Theresa were laughing and talking. Angela was trying to get a CD to work.

We went to Robert Castro's house, which is on Porter Street. Angela parked the car on the street next to the curb, pointing towards the cemetery. I think Angela sat in the car for a little while talking to Theresa. Abel, Chris Hernandez, and me went to the garage to drink a beer. Chris was dropped off right after Abel and I got out of Angela's car. Then Angela got out and joined us in the garage. We stayed there for about ten to fifteen minutes before Angela said she was going to the restroom. During the time we were in the garage, Abel asked Angela a couple of times, to go get her friend, referring to Theresa. Angela kept telling him she was passed out drunk in the car.

When Angela went in the house to use the restroom, Abel told me he was going to go holler at her. I told him, "She's in the car." Abel took off down there. I never thought anything about it. Angela came back after about ten minutes, maybe even fifteen minutes later. Angela might have stayed in the house and talked to Robert Castro who at that point had never come outside.

When Angela came back out, I told her, "You might want to go check on your friend." I did not think Abel would do anything like I heard about now, I just know he likes to take things and figure he might try to steal something from Angela or Theresa. Angela went down to the car and started screaming, "Moses, come get you're fucking friend out of my car." There was a lot of screaming and hollering coming from Angela. I could tell she was upset. Where the car was park, and where we were in the garage, I could not see the car. I got up and went down to the car and tapped on the window while looking in. I saw Abel in the driver's seat trying to pull his pants up. I also saw Theresa hunched over and forward in the passenger seat with what looked like just a shirt on. Theresa did not have any jeans on and was naked from the waist down. I did not try to look at either of them at that time, and told Abel in Spanish to "Get the fuck out." Able got out and was still pulling his pants up and trying to situate them. He kind of made a chuckling sound and went back up to the garage.

As soon as Abel got out of the car, Angela jumped in and her and Theresa left. I then turned to Robert and said get me a ride home. I left with Robert and he dropped me off at home.

 

EXHIBIT-P

My name is Moses Ayala Loya, Jr.. I live at 417 PR 4456, Kempner, Texas 76539. My home telephone 512-525-7216. My social security number is 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. My birth date is July 30, 1977. My Texas ID Number is 24491880. I am giving this statement freely and voluntarily to Investigator Tim Ryan of the Lampasas Police Department. The date is October 13, 2009. The time is 5:10 pm.

On October 9, 2009, at approximately 11:00 pm to 12:00 midnight, Robert Castro dropped me off at the Lampasas AmVets. I went down there to have a beer. I walk in and sat at a table by myself. I notice my nephew, Robert Resa was there and talked to him a little while. I also noticed Ramon Castro, Abel Medrano, Angela Walker, and Theresa Robles were sitting on the opposite side of the bar. Abel was even sitting on the opposite end of the girls. After a while Abel saw me and said, "You weren't going to tell me you were here?" I said. No just playing around. Abel and my nephew joined me and we sat and talked. Later in the night about 10 or 15 minutes before closing Ramon, Angela, and Theresa came over and sat down with us. We talked just for a little bit.

Once the they kicked the lights on, I went outside to wait on my ride, then Abel came out. Shortly afterwards Theresa, Angela, and Ramon came. Angela said, "Awh, do ya'll need a ride?" Abel and I accepted the ride. Angela drove her car, Theresa sat in the front passenger seat, and Abel and I got in the back seat. I did not say much because Abel, Angela, and Theresa were laughing and talking. Angela was trying to get a CD to work.

We went to Robert Castro's house, which is on Porter Street. Angela parked the car on the street next to the curb, pointing towards the cemetery. I think Angela sat in the car for a little while talking to Theresa. Abel, Chris Hernandez, and me went to the garage to drink a beer. Chris was dropped off right after Abel and I got out of Angela's car. Then Angela got out and joined us in the garage. We stayed there for about ten to fifteen minutes before Angela said she was going to the restroom. During the time we were in the garage, Abel asked Angela a couple of times, to go get her friend, referring to Theresa. Angela kept telling him she was passed out drunk in the car.

When Angela went in the house to use the restroom, Abel told me he was going to go holler at her. I told him, "She's in the car." Abel took off down there. I never thought anything about it. Angela came back after about ten minutes, maybe even fifteen minutes later. Angela might have stayed in the house and talked to Robert Castro who at that point had never come outside.

When Angela came back out, I told her, "You might want to go check on your friend." I did not think Abel would do anything like I heard about now, I just know he likes to take things and figure he might try to steal something from Angela or Theresa. Angela went down to the car and started screaming, "Moses, come get you're fucking friend out of my car." There was a lot of screaming and hollering coming from Angela. I could tell she was upset. Where the car was park, and where we were in the garage, I could not see the car. I got up and went down to the car and tapped on the window while looking in. I saw Abel in the driver's seat trying to pull his pants up. I also saw Theresa hunched over and forward in the passenger seat with what looked like just a shirt on. Theresa did not have any jeans on and was naked from the waist down. I did not try to look at either of them at that time, and told Abel in Spanish to "Get the fuck out." Able got out and was still pulling his pants up and trying to situate them. He kind of made a chuckling sound and went back up to the garage.

As soon as Abel got out of the car, Angela jumped in and her and Theresa left. I then turned to Robert and said get me a ride home. I left with Robert and he dropped me off at home.

EXHIBIT-Q

would and went inside. I went straight to take a shower and brushed my teeth. I wrapped my clothes up. I did not know if I was going to report it to the police or not at the time. After taking a shower I did urinate and felt some pain when I wiped my vagina, like maybe it was raw or something was torn. I also felt soreness on my knees and noticed they were red on insides. I also felt some pain in the center of my right butt cheek. When brushing my teeth I noticed a red mark above my left breath. I brushed my teeth a second time. I normally do not brush my teeth twice I just felt dirty. I did not taste anything in my mouth. I went to bed and laid there for a while and just laid there praying to go to sleep because I just could not believe it happened and I did not want to think about it. I never saw any semen on or around me.

The next morning I woke up around 9:00 am, because I had to pick up my niece for previous plans. I stopped to buy some things and found that I was missing the money from my purse. I was missing about 140 something dollars that I know was there the night before. I had a $100 and $50 bill and while at AmVets and bought a drink for Angela and myself with the $100 bill. I called Angela to see if she had found or would look for my money in her car. Angela did not find the money. Again Angela told me to call her if I needed to talk. She also said, that I should go to the police and should definitely go to the hospital. I told her I could not talk then and would call her later.

After doing what I had planned with my niece, I took her to my parents house and then about 1;00 pm, I went to the HEB Pharmacy and got the Plan B pill. I took the pill immediately, then returned to my parent's house. I never spoke a word about what had happen to me. For the rest of the day on Saturday, I stayed to myself. One of my friends, Johnny Martinez asked me what was wrong and said I seemed depressed. I told him it must be the weather.

On Monday I text Angela and said " Hey, So I have to ask do u think he had sex with me? Im scheduling an appoint 4 today but I honestly don't know what happen! I am so fucking disgusted and pissed." I also asked, "how did u know to go out there and find him there?" Angela told me that she went to the bathroom and when she got back, Moses said you better go and check on your friend. Then said, that's when I went out. I asked Angela if he, speaking of Moses knew what happened. She said yes he did know and there is evidence in my seat. Angela said, she had not washed it because she was going to wait to see what I did. Angela said she would go with me if I wanted and she knew what she saw. I told her ok and that I was going to call her in a bit.

After getting her work number I did call her and talk to her. In addition, to what she text me, Angela said she saw Able with his pants down and me without pants. She said for me to try to go to the police and do it soon as possible because she did not want to forget anything she saw. Angela said she would call me back in a little while because people were walking up to her desk. I told her that was fine. I text her back and asked her not to tell Moses I was going to the cops. She text back saying she promise and was not going to tell anyone. I thanked her.

I never got a chance to talk to her in detail because her work environment does not let her have much privacy. Angela works at Harley Davidson in Round Rock. I called the Lampasas Police Department on Monday, October 12, 2009. I text Angela and told her I was going to the police department and she said she was on her way too.

While giving this statement I notice I am also missing a work ID card from my work and it was in the same little black make-up bag that the money was in. I also showed Investigators Ryan, Cummings, and Bailey the bruises on the inside of my knees that were red the night I took the shower.

I have read this entire statement, consisting of 4 page(s), each of which bears my signature,

EXHIBIT-R

# PSEUDONYM FOR SEXUAL ASSAULT SURVIVORS
## All information will be kept confidential.

Law enforcement agency __Lampasas P.D._____ Phone number _____

Case # _____ **Pseudonym*** ___LISA TO EVANS___

Real Name __Theresa Rene Robles__

Real Address __403 East Pecan Street__

Real Phone # (day) __512-762-0222_____ (evening) _____

Alternate Contact Name _____

Alternate Contact Phone # (day) _____ (evening) _____

* This name will be used in all public files to take the place of your real name. Your correct address and phone number will also be protected. (Texas Code of Criminal Procedure Art. 57.01).

## RELEASE OF INFORMATION

To assist law enforcement with their investigation and obtain further assistance, I give permission for specific limited release of my real name, address, and phone number. By checking the following, my real information may be released to these specified agencies.

✓ Local sexual assault program                 ✓ District Attorney Crime Victim Coordinator

✓ Law Enforcement Crime Victim Liaison         ✓ My medical insurance carrier

✓ Court-ordered restitution office             ✓ Crime Victims' Compensation

Survivor's Signature (please use real name) _____ Date _____

Law Enforcement Officer's Signature _____ Badge number _____ Date _____

The following program is available to you: _____
(Program name and phone number to be filled in by the officer)

For more information please contact:

The Office of the Attorney General
Sexual Assault Prevention and Crisis Services, MC 011-1
PO Box 12548
Austin, Texas 78711-2548

Phone   (512) 936-1279
Fax     (512) 936-1650
E-Mail  sapcsd@oag.state.tx.us

2-12-09   10:35 am   SR